DIAMOND CATTLE COMPANY, Respondent, *v.* GUY LE ROY STEVICK, Appellant, Impleaded with ROCK RIVER PETROLEUM COMPANY and NEW YORK TRUST COMPANY, Defendants.

First Department, December 16, 1921.

Principal and agent — action to declare as property of plaintiff secret profit received by defendant agent in sale of oil and gas rights — evidence warranting conclusion that agent fairly represented both plaintiff and purchasers and that he was to receive compensation from purchasers — defendant's counterclaim for commissions from plaintiff dismissed where minds of parties never met as to such payment.

In an action to declare as property of plaintiff a secret profit received by the individual defendant as agent in effecting a sale of oil and gas rights connected with plaintiff's real estate holdings in Wyoming based on the acceptance of commissions from the purchasers, *held*, that the complaint should be dismissed upon the merits, since the undisputed facts establish that the plaintiff's officers as well as its chief stockholder were fully aware that the defendant was representing both the plaintiff and the purchasers, and that he was to receive a commission or compensation for his services from the purchasers and that he acted in good faith toward the plaintiff.

The defendant did not sustain the burden of proof upon his counterclaim based on commissions alleged to be due from the plaintiff from said sale, for the minds of the parties never met as to the payment to the defendant of any commissions which payment was conditioned upon the approval of the plaintiff's chief stockholder and it was not shown that she ever gave her approval.

APPEAL by the defendant, Guy LeRoy Stevick, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 7th day of March, 1921, upon the decision of the court rendered after a trial at the New York Special Term adjudging (1) that plaintiff is the owner of 400 shares of the capital stock of defendant Rock River Petroleum Company, represented by certificate No. 4 issued to the appellant, and on deposit with the New York Trust Company, and directing the delivery thereof to the Rock River Petroleum Company for cancellation, and further directing that company to issue a new certificate for a like number of shares to the plaintiff; (2) that the counterclaim of the defendant Stevick against the plaintiff for $9,750 be dismissed on the merits; (3) that plaintiff recover of said defendant $250 theretofore paid to him on account of his commissions in making a sale of plaintiff's property, together with costs taxed against him in the sum of $146.50.

*Robert W. Bonynge* [*Fred Herrington* of counsel], for the appellant.

*Austin, McLanahan & Merritt* [*George C. Austin* of counsel; *Scott McLanahan* with him on the brief], for the respondent.

GREENBAUM, J.:

The complaint alleges that Stevick, the defendant, appellant, acted as plaintiff's agent in effecting a sale of oil and gas rights and royalties connected with plaintiff's real estate holdings, located in the State of Wyoming, for the sum of $200,000 cash and twenty per cent of the stock of a new company to be organized by the purchasers for the purpose of taking title to the property and exploiting the same for the market; that plaintiff agreed to pay Stevick a commission of five per cent, subject to the approval of one Mrs. Elizabeth S. Bosler, a then resident of Philadelphia, Penn., who owned practically all of the stock of the plaintiff company; that Stevick was intrusted by the plaintiff's president and secretary, who resided at Carlisle, Penn., with the mission of calling upon and submitting to Mrs. Bosler for her approval the terms of the proposed sale, including the payment of commission of five per cent to defendant; that Stevick reported to the president and secretary that he had fully informed

Mrs. Bosler of all of the said terms, including the matter of the commission, and that she had approved the same, when, as matter of fact, he did not inform her that the sale would be subject to any commission to be paid to him; that the contract of sale was thereafter executed at Carlisle, Penn., on February 20, 1919, at which time $5,000 was paid plaintiff by the purchaser on account, and Stevick then received from plaintiff $250, being five per cent on account of his commission; that some time thereafter plaintiff discovered that Stevick, at the time he was negotiating the sale on behalf of plaintiff, obtained from the purchaser a secret agreement whereby the latter would also give him a commission in the form of five per cent interest in the stock of the proposed new company, and that a certificate for such stock interest was issued to defendant on April 26, 1919. The complaint demands judgment, among other things, that by reason of Stevick's breach of trust and violation of the rules of law governing his conduct as plaintiff's agent, the secret profit he received from the transaction be declared to be the property of the plaintiff. The Rock River Petroleum Company and New York Trust Company were made formal parties defendant.

Appellant's amended answer put at issue the material allegations of the complaint, and pleaded a counterclaim for the balance of commissions, viz., $9,750.

Plaintiff's amended reply to the counterclaim contained substantially the same allegations as the complaint, and asked for an affirmative judgment that the appellant's commissions be forfeited and that plaintiff recover the $250 previously paid on account thereof.

The crucial questions in this case are whether defendant Stevick, in bringing about the sale in question, was acting solely for plaintiff or for both purchaser and seller with plaintiff's consent, and whether he was to receive a compensation for his services from the plaintiff as well as from the purchaser. Of course, if defendant was acting only as the agent of the plaintiff, and entered into a secret arrangement with the buyers to obtain a commission from them, and failed to disclose that arrangement to the plaintiff corporation, it would be entitled to the relief here sought.

First Department, December, 1921.          [Vol. 199

The record discloses that Mrs. Bosler was a widow, whose husband Frank C. Bosler, at the time of his death was practically the owner of the properties in question, and that she upon her husband's death, as his residuary legatee, became the owner thereof; that the defendant Stevick had been an intimate friend of many years' standing of both the deceased Mr. Bosler and his wife; that upon her husband's death, his cousin, Abram Bosler, became president of the plaintiff company, and a Mr. McKeehan, an attorney and friend of the family, acted as secretary of the company, to relieve her of the responsibility of attending to the details incident to the ownership of the property. Mrs. Bosler actually owned 3,832 shares of stock of the plaintiff corporation out of a total issue of 4,000 shares.

The admitted and uncontradicted evidence establishes that the plaintiff knew that the defendant was acting for both parties to the transaction, and that there was no objection on its part or by Mrs. Bosler to Stevick's receiving compensation from the purchaser. The negotiations were started by a telegram sent to Abram Bosler by Stevick, who was then residing in San Francisco, Cal., referring to the fact that he had parties to whom he " might sell entire real estate holdings in which you and Frank Bosler's estate [are] interested in Wyoming." The telegram asked for certain details about the property, as also the best price and terms of sale, " subject to commission of five per cent," and concluded with the following words: " If any other parties negotiating for sale let me have opportunity to present matter to my parties."

Abram Bosler replied that " Diamond Ranch is not on market." Stevick sent a second telegram to Bosler which stated: " Friends of mine who are among wealthiest and most successful oil producers asked me to wire you concerning purchasing Wyoming lands. I submitted your reply to them. They are willing to purchase Diamond Ranch outright, but if that is not possible wish to make some arrangement for developing oil possibilities on it either on cash purchase basis or otherwise. They are in best possible position to make money for both you and themselves. I have advised them that I am willing to negotiate with you only on basis of utmost fairness to both parties. They are willing to pay my

expenses East to discuss matter with you. Inasmuch as you do not want to sell land outright believe I can work out a plan which will benefit both parties. Wire whether you are willing to consider matter and if so when I can see you." Bosler answered the telegram as follows: "Your message received. Will be glad to see you and discuss oil proposition as soon as convenient for you to reach Carlisle. The only leases made are to the Ohio Oil Co., who have twenty-eight rigs in operation on the Diamond Ranch. We have a number of parties negotiating for additional leases. Will do nothing till after we discuss matter with you. A large acreage of its most desirable land is open." Stevick telegraphed reply: " Leaving for Chicago to-morrow. Will meet my parties there Friday evening. See you Sunday or Monday."

When Stevick arrived at Carlisle, a person named Bowen, of Denver, Col., introduced himself to him at the hotel where Stevick was stopping as a guest, and told him that he was negotiating for an offer of the plaintiff's properties, at the same time showing him certain papers which stated that any proposition that would be presented to the Boslers would be referred to him, so that he might have an " opportunity to make as good or better proposition " than any other parties would make. Stevick confronted the officers of the plaintiff with the position that Bowen was taking in the matter, and stated that he would not go on any further with the transaction until they could assure him that they were relieved from any obligation to give Bowen a refusal of any offer that Stevick made. It seems that this refusal was actually given to Bowen after Stevick had left San Francisco, notwithstanding that the telegram of Mr. Bosler stated: " Will do nothing till after we discuss matter with you." An understanding, however, was reached which resulted in the elimination of Bowen by the payment to him of certain shares of stock in the company that was to be organized by the parties who were negotiating for the purchase of the oil rights and properties. Thereafter Stevick met Bosler and McKeehan at Carlisle and had extended conferences with them. Mr. Bosler testified that during the talks with Stevick the latter stated " that he represented certain parties in Denver and told us of their responsibility * * * and said that he would be very glad at the proper

time to state who they were." He also testified that Stevick " told us that he was very glad to have an opportunity of coming there to take up this matter with us, particularly on account of the long family friendship there was for my cousin, Mr. Frank Bosler, and also his private relations with me and Mrs. Bosler. * * * Finally we got to the matter of who was to pay the commission. I stated to Mr. Stevick that we would not have any dealings until the matter of terms was settled in advance so that we would have a clear understanding. He said that it did not make any difference to him who paid the commission, it was as broad as it was long, * * * whether he got it from the purchaser or the seller. We stated that as far as we were concerned we preferred to have the purchasers pay the commission, and he said that that was satisfactory to him." Bosler also testified that he told Stevick " that any negotiations that would take place in this thing would have to have the final approval of Mrs. Bosler, and that we were simply acting for her, practically as her agents in this matter, although we were officers and directors of the company, when details were completed they would have to be submitted to her for final approval and that we would not do it on any other basis." Mrs. Bosler at that time was in Philadelphia.

He also testified that on the following morning at another interview Stevick said " that he had been thinking the matter over of the commission and that he had changed his mind. He believed that he would prefer to have the Diamond Company pay the commission rather than the other people. We said that was entirely satisfactory."

Referring to the talk about the commission, Mr. McKeehan testified as follows: " I asked him exactly what he had in mind on that proposition, and I asked him whether he expected that we should quote a figure which should be net to us, or whether we should quote a figure which would allow us to pay him the five per cent commission, and he said: ' It really does not make a particle of difference in the outcome of this matter as to what is done in that regard.' He said: ' You can readily see that if the purchasers have to pay the commission they will pay you that much less,' and I agreed with him as to that being a practical proposition and that that was probably true;

and he said that he wanted to reiterate what he had said in that telegram, but he proposed to be absolutely frank with all parties in this transaction, and that we were all friends of his, and that if we paid a commission he would tell them, and if they paid us a commission he would tell us, and the cards were all put on the table, and it would be therefore immaterial as to who drew the check or where the commission came from or both, and he understood exactly what he got, and it was a mere matter of bookkeeping, you might say; and he said: ' Have you any preference in the matter? '  And I said: ' Yes, I can think of advantages from the standpoint of the Diamond Cattle Company having a net sum received,' and he said: ' That is perfectly satisfactory to me,' and so far as that was concerned we thought that ended it, and it did end it for that conference."

The defendant Stevick practically admitted that the conversations as to commission as testified to by Bosler and McKeehan were correct.

These witnesses also testified that it was made clear to Stevick that nothing in the matter could be done without the express approval of Mrs. Bosler, whereupon Stevick said he would gladly go to Philadelphia and explain in detail the proposed terms of the sale, including the matter of the five per cent commission.  Mrs. Bosler testified that Stevick fully explained the terms and details of the proposed sale, but that he stated nothing about commissions; that, referring to the $200,000 in cash to be paid in part consideration by the purchasers, she stated that that sum would about equal the amount necessary to clear the obligations of the plaintiff company, and that Stevick congratulated her that she would be able to accomplish such a result.  Stevick practically admitted, or did not contradict, the testimony of Mrs. Bosler.

McKeehan admitted upon his cross-examination that he understood that Stevick was representing the purchasers, and that he was told that Mr. Schuyler, an attorney and a friend of Stevick, was one of the parties whom he represented, at the same time explaining his associations with Schuyler.  He was asked on cross-examination: " Q. Did he say that you might have the impression that Mr. Schuyler was his principal? A. As I said a while ago, Mr. Bosler asked him directly if

Mr. Schuyler was not one of his principals.   Q. What did he say in reply?   A. He said that Mr. Schuyler was one of the crowd."

The uncontradicted testimony shows that, owing to Bowen's claims, the proposition submitted by Stevick was declared " off," and that negotiations were thereafter resumed.   Stevick had originally expected to close the transaction upon the following terms: $200,000 and the payment to the plaintiff and Mrs. Bosler of twenty-five per cent of the stock of the corporation to be organized, and which thereafter was organized as the Rock River Petroleum Company, one of the defendants. Owing to the tactical position occupied by Bowen, Stevick's principals would not continue negotiations until Bowen's claims were so disposed of that there was no possibility of any litigation arising which might tie up the property.   A settlement was made with Bowen, whereby he was to receive a portion of the stock of the Rock River Petroleum Company. That was accomplished by a new proposition made by the proposed purchasers through Stevick that they would pay $200,000 in cash and twenty per cent, instead of twenty-five per cent, of the capital stock of the petroleum company. The adjustment with Bowen was effected with the consent and co-operation of the plaintiff and Mrs. Bosler.   A contract was finally prepared for the sale of the properties, which contained the following clause: " Any stock interest which shall be paid to Allen B. Bowen, B. D. Townsend, his attorney, or to Guy Le Roy Stevick, shall be paid out of the 8,000 shares of retained stock of the said Martin Paskus, and not out of the treasury stock."

Mr. Paskus was the attorney for the purchasers, who prepared the agreement in the presence of all the parties concerned, and who, upon being questioned as to whether anything was said about the clause in the contract above quoted, testified as follows: " I told her [meaning Mrs. Bosler] that we [referring to the purchasers] had agreed to give Mr. Bowen a certain amount of the stock of this company just the same as we were going to give stock to Mr. Stevick," and further that Mrs. Bosler stated that " she did not care what Stevick got, and if Stevick made any money out of the transaction she was only too happy."

Mr. McKeehan's testimony of this incident was that Stevick stated when the contract was being drawn: " I feel that any stock that I get out of this ought to come·out of the eighty per cent of the stock which is to go to the purchasers rather than out of your twenty per cent." Mr. Bosler testified on this subject that when he saw that Stevick was to receive a portion of the stock of the new company, he called Stevick to one side and asked him what was his (Stevick's) name doing in the contract, and was told that " Schuyler is going to arrange for some stock for me."

Mrs. Bosler being asked upon cross-examination whether she made any objection to the payment of the stock interest to Mr. Bowen, answered: " I think I expressed very definitely at the time that although I did not know Mr. Bowen, I had a recollection that my husband did not like Mr. Bowen, and, therefore, I did not want to be interested in anything that Mr. Bowen was interested in, especially when it concerned my own property, and I was very fixed and determined that I did not want to be connected with Mr. Bowen because I remember my husband's feelings toward Mr. Bowen — whether there was any basis for it I could not say, but I know that Mr. Bosler did not regard him in the highest way." She was then asked: " Q. You made no objection to Mr. Stevick obtaining a stock interest? A. I did not."

Mr. Paskus testified as to the clause in the contract which referred to the payment of stock to Stevick as follows: " Q. At whose suggestion was this clause put in the contract, ' that any of the stock to go to Stevick — any stock interest which shall be paid to Allen B. Bowen, B. D. Townsend or to Guy Le Roy Stevick shall be paid out of the 8,000 shares of the retained stock of the said Martin Paskus and not out of the treasury stock.' At whose suggestion was that provision put in the agreement? A. I do not know at whose suggestion that particular provision was put in there, but I suggested to Mr. Stevick in our general conversation going down on the train, I suggested to him that in view of the fact that there was a lady interested in this transaction, that there would be no room for any doubt or dispute at any time thereafter, in fact since he was getting a stock interest from us he had better have the contract so state."

First Department, December, 1921.        [Vol. 199

Mr. Paskus also testified as follows: " Q. Was there any comment with reference to that clause in the contract in your presence or hearing? A. There was. Q. Who made the comment? A. The comment was made by Mrs. Bosler. Q. What comment did she make? A. Mrs. Bosler was reading that contract and she came down to that clause, and she said, ' Here I stop,' and I said, ' Why ? ' And she said, ' I won't go into any transaction or put my name to any agreement in which the name of Allen Bowen is connected,' and she said: ' Allen Bowen is a man who is entirely distasteful to me. My husband had no use for him, and I have no use for him, and I will not sign any agreement by which I am to become interested in a company in which Allen Bowen is going to have any interest.' Q. Did you explain to her the reason why he was to get an interest? A. I certainly did. Q. What reason did you give her for that interest going to Bowen? A. I said to Mrs. Bosler that Mr. Allen Bowen was not any more welcome to the Elk Basin Petroleum Company or to ourselves in the transaction than evidently he was to her, and that Mr. Bowen had a nuisance value in this situation and that we had made an agreement with Mr. Bowen under which he was to receive a stock interest in payment of what I consider his nuisance value and which I said to her was two-fold, in the first place he had certain documents in relation to the properties that were affected by our deal, and while the claim was being made by the interests in Carlisle that these documents were procured by fraud from a certain Mr. Bishop who was the representative of these Carlisle people on the property, I was not going to go into a lawsuit and pay $200,000 for the privilege of fighting out anything with Mr. Allen Bowen or anyone else, and that in addition to that Allen Bowen had a letter which he construed to be an agreement on the part of the Diamond Cattle Company under which Bowen was to have the first right to meet any proposition for the purchase of these properties or the oil rights, and that he was to have the right to first purchase that at the same terms, and I said under those circumstances we had made that agreement with Mr. Bowen, that she would have to understand that, and that if we were going to make the transaction it would have to be in pursuance to those arrange-

ments that we had made with Mr. Bowen. Q. Did you tell her what arrangements you had made with Mr. Bowen? A. I told her that we had agreed to give Mr. Bowen a certain amount of the stock of this company just the same as we were going to give stock to Mr. Stevick. Q. Did you say anything about any financial arrangement with Mr. Bowen? A. I said to Mrs. Bosler that * * * in this agreement we had agreed to hold her harmless from the claim of Mr. Bowen for a fee and also for disbursements by Mr. Bowen in connection with the transaction. The Carlisle people refused to have anything to do with Mr. Bowen or to recognize those terms, and I told them that we had agreed to take care of Mr. Bowen and to make that payment, and that the claim made by Mr. Bowen in that regard amounted to $10,700, and I said that we would pay that $10,700 to Mr. Bowen whether he was entitled to it or not, because we had agreed to make the payment to him. Q. Was there anything else said with reference to that clause by Mrs. Bosler, any reference to Stevick's stock interest? A. She stated that she did not care what Stevick got, and if Stevick made any money out of the transaction she was only too happy, but she did not want to have anything to do with the transaction, the fact Mr. Allen Bowen was to get any interest in the stock in which she was interested, and she was very, very positive about that."

We thus have an array of undisputed facts, oral and documentary, which tend to the inevitable conclusion that the plaintiff's officers, as well as Mrs. Bosler, were fully aware that Stevick was representing both seller and purchasers, and that he was to receive a commission or compensation for his services from the purchasers.

There is not the slightest evidence that Stevick did not faithfully represent the plaintiff in the negotiations, nor is there any suggestion that he could have received any better proposition than that upon which the transaction was closed. It is true that nothing was said as to the amount of stock Stevick was to receive for his commissions. But he was not asked how much he was to receive and as matter of fact it appears that it amounted to five per cent, not of the treasury stock, but upon 8,000 shares which were to be retained by the purchasers, through their attorney, Mr. Paskus. There

can be no doubt that the findings upon which the judgment was appealed from, so far as they state that the plaintiff's officers and Mrs. Bosler knew nothing of Mr. Schuyler's connection with the Elk Basin Petroleum Company, and that they did not know that the purchasers were to pay any compensation or commission to Stevick, are contrary to and not warranted by the undisputed proofs.

It follows that the findings of fact and law of the learned trial justice that the defendant Stevick did not act fairly, honestly and in good faith towards the plaintiff must be reversed, and that findings consistent with the evidence as adduced upon the trial be made by this court.

It also follows that the complaint must be dismissed upon the merits.

With respect to the counterclaim of the defendant Stevick, however, we find a situation which would justify an affirmance of the judgment dismissing the counterclaim, and granting judgment against the defendant in the sum of $250, paid to him by plaintiff on account of his commissions.

At the outset of the discussion upon this phase of the case, it was observed that the complaint in effect alleges that although it had been agreed between the plaintiff's officers that the defendant was to be paid five per cent commission in the event of the consummation of a sale, that agreement was coupled with the condition that it was only to be operative in case Mrs. Bosler approved of it, and hence that Stevick was not entitled to any commissions.

It has already been shown that Stevick did not mention the subject of commissions to Mrs. Bosler, and there is no evidence that she had ever approved of the payment of commissions by plaintiff. It also appears that the plaintiff's officers preferred that the purchasers pay the commissions, and that at one time Stevick acquiesced in the proposal, all parties being of one mind that it really made little difference whether seller or purchasers paid the commissions, since if the buyers paid them, they would naturally expect to pay less for the properties than they otherwise would. It also appears that after Stevick had stated that it was agreeable to him to receive his commissions from the purchasers, he subsequently changed his mind and said he preferred to receive them from

the plaintiff. Plaintiff's officers consented to the change, provided that Mrs. Bosler assented thereto. But her assent was never secured. Besides, the original proposition for purchase fell through on account of Bowen. Negotiations were thereafter resumed after settling the Bowen claim, when a new proposition was made by the purchasers, the effect of which was to reduce the original offer to pay to the seller twenty-five per cent of the stock of the new company, to twenty per cent in addition to the payment of $200,000 cash. When Stevick communicated this new proposition to Mrs. Bosler, the evidence shows that she told him that the $200,000 cash was to be *net* to the company, meaning thereby that it was not to be subject to any deductions, inasmuch as that sum was required to liquidate the obligations of the plaintiff corporation. Upon the proof, the minds of the parties never met as to the payment to Stevick of any commissions by plaintiff. Moreover, since the plaintiff's officers and Stevick understood that Stevick was to receive but one commission, that is, from either the purchasers or the seller, and the fact is that when the transaction was closed, all the parties knew that Stevick's commissions were to be paid by the purchasers, the defendant Stevick did not sustain the burden of proof that the plaintiff had obligated itself to pay him any commission. It is true that when the agreement of sale was made, the plaintiff's officers paid $250 to Stevick, being five per cent of $5,000 paid by the purchasers on account, but they were evidently then under the impression that Mrs. Bosler had approved of the payment of a commission to Stevick.

The judgment so far as it dismisses defendant's counterclaim and grants judgment for plaintiff for $250 is affirmed, and in other respects reversed and the complaint dismissed, without costs to either party.

CLARKE, P. J., DOWLING, SMITH and PAGE, JJ., concur.

Judgment, so far as it dismisses counterclaim and grants judgment for plaintiff for $250, affirmed, and in other respects reversed, and complaint dismissed, without costs. Settle order on notice.